CHICAGO, R. I. & P. RY. CO. v. CHICKASHA NAT. BANK. †

(Circuit Court of Appeals, Eighth Circuit.   November 5, 1909.)

No. 3,023.

1. PRINCIPAL AND AGENT (§§ 106, 108*)—GENERAL AGENT—IMPLIED AUTHORITY.

An agent authorized to purchase cotton for his principals in a particular locality from any persons having the same for sale and at any price agreed on between them was a general agent with implied authority to bind his principals by any contract for the purchase of cotton in that locality, but such implied authority did not extend to the opening of an account with a bank in the name of his principals, borrowing money, and pledging their securities as collateral therefor, where the same was not a necessary incident to the business of purchasing cotton, such power being an unusual one to be conferred on an agent, and not to be implied whether his agency is general or special, unless the very nature of his business requires its exercise.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. §§ 106, 108.*]

2. PRINCIPAL AND AGENT (§ 122*)—EVIDENCE OF AGENCY AND AUTHORITY—DECLARATIONS OF AGENT.

The acts and declarations of an agent are incompetent to prove the extent and scope of his power to bind his principals. ·

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 416-419; Dec. Dig. § 122.*]

3. EVIDENCE (§ 89*)—ACTUAL NOTICE—PRESUMPTION FROM MAILING OF LETTER.

Proof of the mailing of a letter addressed to a firm and directed generally to "St. Louis, Missouri," containing no specific address or statement of the firm's business, is not sufficient to charge the firm with notice of its contents against their denial of any knowledge of it.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 89.*]

4. PRINCIPAL AND AGENT (§ 166*)—RATIFICATION BY PRINCIPAL OF ACTS OF AGENT—KNOWLEDGE OF FACTS.

In an action of replevin against a railroad company to recover cotton represented by bills of lading which had been pledged to plaintiff by an agent of the owners who made the indebtedness in the name of his principals and pledged the collateral therefor without authority to establish a ratification which would sustain the action, it was incumbent on plaintiff to prove that, at the time of the alleged ratification, the principals had knowledge, not only of the indebtedness, but also of the pledge.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 627-633; Dec. Dig. § 166.*]

5. TENDER (§ 19*)—OPERATION AND EFFECT—EFFECT AS ADMISSION.

The rule that a plea of tender entitles plaintiff to judgment for at least the sum tendered is based not on the act of tender, but on the admission it carries with it, and applies only where the tender was unconditional, and not to a tender made under protest to secure the release of collateral, where both the written tender and the pleading deny liability.

[Ed. Note.—For other cases, see Tender, Cent. Dig. §§ 59-64; Dec. Dig. § 19.*]

In Error to the Circuit Court of the United States for the Eastern District of Oklahoma.

Action by the Chickasha National Bank against the Chicago, Rock Island & Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Reversed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied February 16, 1910.

F. M. Etheridge (Homer B. Low, Charles M. Fechheimer, and J. M. McCormick, on the brief), for plaintiff in error.

Warren K. Snyder (F. E. Riddle, on the brief), for defendant in error.

Before VAN DEVANTER, Circuit Judge, and CARLAND and POLLOCK, District Judges.

POLLOCK, District Judge. This was an action in the nature of replevin brought by the Chickasha National Bank of Chickasha, in the Indian country, now Oklahoma (hereinafter called the "Bank"), against the Chicago, Rock Island & Pacific Railway Company (hereinafter called the "Railway Company"), to recover possession of 1,041 bales of cotton, or, in lieu thereof, a judgment against defendant for the amount or value of the special interest therein claimed by the Bank.

The facts necessary to a decision of the questions presented in this record are these:

In the autumn of 1906 a copartnership, composed of A. L. Wolff, Maurice Stern, and Bertholf Stern, of St. Louis, Mo., doing a cotton merchant business in the firm name of A. L. Wolff & Co. (hereinafter called "Wolff & Co."), sent as their agents into the then Indian country in the neighborhood of Chickasha one E. G. Carter, one H. C. Ryan, and others to purchase cotton on behalf of the firm. From the manner of conducting this business, as employed by Wolff & Co., the agents were intrusted with the custody and expenditure of no money whatever except such small sums as were necessary to pay personal expenses. On the contrary, when a purchase of cotton was made by the agent from the owner, a bill of lading was procured by the owner from the railway company for the cotton so purchased, in which bill of lading was stated the number of bales purchased, on whose account, and the cotton was consigned to Wolff & Co., Chickasha, or on shipper's order, with directions to notify Wolff & Co. This was done in order that the cotton might be assembled at Chickasha for the purpose of being compressed; there being a compress plant at that place. A draft was then drawn by the agent on Wolff & Co. at St. Louis or the city of Oklahoma City, in favor of the vendor of the cotton, who attached to the draft the bill of lading, and this draft, with bill of lading, was forwarded through regular commercial channels to Wolff & Co. at the city of St. Louis or Oklahoma City, where the draft was presented, accepted, and paid by Wolff & Co. The bills of lading when received were detached from the drafts and returned to the agent at Chickasha for the purpose of procuring a delivery of the cotton from the Railway Company to the compress company, and, when compressed, was reconsigned as the owners might direct. As shown by the record, the sole authority conferred by Wolff & Co. on their agents in the purchase of cotton in their name and on their behalf was to conduct the business in the manner above stated.

However, Carter, as agent for Wolff & Co., in transacting the business of his principals, did not confine his operations to the method adopted by them, but, on the contrary, he agreed with the president of the Bank to open an account therein in the name of his principals;

that drafts and checks drawn by him on his principals should be cashed by the Bank and charged to such account; that exchange should be paid the Bank by his principals and charged to this account; that his principals would pay interest on any overdraft created in such account at the rate of 10 per cent. per annum; and that collateral securities would be pledged the Bank for the repayment of any money advanced by way of overdraft on such account.

In pursuance of this arrangement with the Bank, an account was opened therein in the name of Wolff & Co., September 26, 1906. This account was thereafter debited and credited with many amounts until about December 7th thereafter. The agent, Carter, also opened an individual account with the Bank. Thereafter Carter proceeded with the prosecution of the business of buying cotton for his principals and assembling the same at Chickasha, executing and delivering to the vendors of the cotton drafts payable to their order, or in some cases to the Bank, drawn on his principals, which were attached to bills of lading issued by the Railway Company for the cotton purchased, stating the number of bales so purchased, in consecutive order, the weight, how marked, from whom purchased, consigned to Chickasha, either to Wolff & Co. or to shipper's order, notify Wolff & Co. The drafts so issued and delivered with bills of lading attached were received by the Bank and charged on its books against the account of Wolff & Co. opened therein by Carter, and the drafts with bills of lading attached were forwarded through regular commercial channels, presented to and paid by Wolff & Co., either at their place of business in the city of St. Louis or Oklahoma City, Okl. When paid the proceeds were, through the regular commercial channels, remitted and paid to the owner of the draft, as such owner might appear. The bills of lading accompanying the drafts so received by Wolff & Co. upon the payment of the drafts were returned to the agent Carter that delivery of the cotton might be made to the compress company at Chickasha, and compress company receipts obtained therefor, that the cotton might, when compressed, be again reconsigned as the owners might direct.

In this manner the 1,041 bales of cotton in controversy in this action were purchased by agents Carter, Ryan, and others, and in this manner drafts covering the purchase price of each and every of such bales of cotton, with bills of lading attached, were forwarded to, accepted, and paid by Wolff & Co. and the bills of lading returned to the purchasing agent Carter. After the return of such bills of lading to Carter, he having for his own benefit and advantage by the issue of checks on the account of Wolff & Co. with the Bank overdrawn such account, 23 of such bills of lading were delivered by Carter to the Bank as collateral security for repayment to the Bank for any sums of money due the Bank on such account. Thereupon Carter left the country.

Thereafter, and on December 10, 1906, Wolff & Co., learning the situation at Chickasha, made demand in writing of the Bank, as follows:

"Oklahoma City, O. T. Dec. 10, 1906.

"Chickasha National Bank, Chickasha, I. T.—Gentlemen: We demand that you forthwith deliver to Mr. Z. M. Lehman, as our agent, all our property in

your possession, consisting of divers and sundry bills of lading for divers and sundry bales of cotton, aggregating some 1,769 bales, together with all our compress tickets or receipts therefor or pertaining thereto, and as part of this letter, we attach hereto as Exhibit A. detail statement of such bills of lading, as we now recall, with the actual invoiced price of the cotton, plus exchange, set opposite thereto, same aggregating $87,313.26. The actual value therefor is largely in excess of that sum.

"We request a prompt and definite written response to this, our demand."

This demand was refused by the Bank except on condition of payment by Wolff & Co. of the amount claimed by the Bank on the account opened in their name by Carter in amount $6,834.54. Thereupon Wolff & Co. made the following tender in writing:

"Oklahoma City, O. T. Dec. 10, 1906.

"Chickasha National Bank, Chickasha, I. T.—Gentlemen: You illegally detain certain bales of cotton and certain documentary evidence of our ownership therefor, as more particularly set forth in our former letter to you of this date, and you refuse to comply with our demand that you surrender the custody thereof, to which we are entitled, and we therefor under protest and for the purpose of reclaiming the possession of said property, which you unlawfully withhold from us, and for the purpose of avoiding the great probability of further damages in the premises, herewith tender you the sum of $6,834.54 same being the amount, for which as we understand, you illegally detain our said property, conditioned of course, that you forthwith surrender said property, and all of said documents, specified in our former letter to you of this date."

This tender was refused by the Bank on the ground it was not an unconditional offer to pay the amount claimed by the Bank and absolve the Bank from all further liability, and because not authorized by the agent of Wolff & Co., Carter, who had placed the collateral with the Bank.

Thereafter the Bank tendered the railway company the amount of its lawful freight and storage charges and demanded possession of the 1,041 bales of cotton in controversy in this action, which tender and demand was refused by the Railway Company, acting in that respect in behalf of Wolff & Co. Thereupon this action was brought. Although not admitted as a defendant in the litigation, Wolff & Co. assumed the defense for the Railway Company, and defended against the action of the Bank on the strength of their title to and ownership of the cotton involved. From a verdict and judgment in favor of the Bank the Railway Company brings error.

The principal claims of error presented and relied on to work a reversal of the judgment rendered are: (1) The trial court erred in permitting the Bank to prove, through its president, Dwyer, the agreement of Carter that his principals, Wolff & Co., would open the account with the bank, would purchase and pay for exchange, would pay 10 per cent. interest on money borrowed on overdrafts, and would pledge collateral security to the Bank, in the absence of any proof tending to show Carter's authority to bind his principals by such agreement except the acts and declarations of the agent Carter himself. (2) The court erred in denying the request made by defendant to instruct a verdict in favor of defendant on the following grounds: (a) Because on the whole case there was no evidence sufficient to support a verdict or judgment in favor of the Bank; (b) because on the

undisputed evidence the tender made the bank by Wolff & Co. was sufficient, should have been accepted by the Bank, and it should have delivered the documentary evidences of the ownership of the cotton to Wolff & Co., and the court should have so declared as a matter of law.

An examination of the record in this case discloses no controversy whatever as to the extent of the power conferred by Wolff & Co. on its agents, Carter, Ryan, and others, who purchased the cotton in controversy for them. The full extent and scope of the authority and power of such agents was, as has been seen, to make contracts of purchase of cotton from the owners thereof, have it assembled at the compress station of Chickasha by bills of lading issued by the Railway Company, and payment made of the purchase price by drafts attached, in the manner above stated, and the undisputed evidence is all the cotton involved in this controversy was so purchased and so paid for by Wolff & Co.

In this condition of the record it is earnestly insisted by counsel for the Railway Company palpable error was committed by the trial court in permitting the Bank to prove through its president, Dwyer, over the repeated protests and objections of defendant, the verbal agreement made with the Bank by Carter assuming to represent Wolff & Co., which culminated in the opening of the account by Carter in the name of Wolff & Co. with the Bank, the creation by Carter of an overdraft on this account, and the pledging of the bills of lading relied upon by the Bank in this case, without any showing that Carter, the agent, had authority to bind his principals by the contract so made.

The contention made by counsel for the Bank is not that the agent, Carter, possessed any express authority from his principals to bind them by the agreement made or his transactions had with the Bank, but it is contended, as Carter was the general agent of Wolff & Co. in the purchase of cotton in the then Indian country in the neighborhood of Chickasha, that he possessed the implied authority to bind his principals by his contract made and transactions had with the Bank.

Again, it is further insisted, even if Carter be found not to have possessed the power in the first instance to bind his principals by his agreement and transactions with the Bank, yet that Wolff & Co., with full knowledge of such unauthorized acts of its agent, ratified and approved them, and hence are estopped and concluded thereby.

From the undisputed evidence found in the record Carter, as agent for Wolff & Co., possessed the undoubted power to purchase cotton in their names and on their account, not from any particular person or persons, but from owners of cotton in general, at such price as he might offer, and in so acting bind his principals. He was therefore in the purchase of the cotton in dispute the general agent for that firm. Mr. Justice Strong, delivering the opinion of the Court in Butler v. Maples, 9 Wall. 766, 19 L. Ed. 822, said:

"The distinction between a general and a special agency is in most cases a plain one. The purpose of the latter is a single transaction, or a transaction with designated persons. It does not leave to the agent any discretion as to the persons with whom he may contract for the principal, if he be empowered to make more than one contract. Authority to buy for a principal a single article of merchandise by one contract, or to buy several articles from a per-

son named, is a special agency, but authority to make purchases from any persons with whom the agent may choose to deal, or to make an indefinite number of purchases, is a general agency. And it is not the less a general agency because it does not extend over the whole business of the principal. A man may have many general agents—one to buy cotton, another to buy wheat, and another to buy horses. So he may have a general agent to buy cotton in one neighborhood, and another general agent to buy cotton in another neighborhood. The distinction between the two kinds of agencies is that the one is created by power given to do acts of a class, and the other by power given to do individual acts only. Whether, therefore, an agency is general or special, is wholly independent of the question whether the power to act within the scope of the authority given is unrestricted, or whether it is restricted by instructions or conditions imposed by the principal relative to the mode of its exercise."

If, therefore, the question here in dispute arose out of any contract made by Carter with the owner of cotton for its purchase, or the terms of any such contract of purchase, the authority of the agent, Carter, to bind his principals, would be clear, although he might have violated secret instructions from his principals in the making of such contract.

However, the question here presented is: Did Carter, the general agent of Wolff & Co., for the purpose of buying cotton on their account in the neighborhood of Chickasha, possess the implied authority to make the contract he did make with the Bank, and on the strength. of this contract bind his principals either to the repayment of money borrowed by him from the Bank, or by his act in pledging the evidences of the ownership of the cotton in dispute as collateral security for such repayment? Independently of any claim of ratification made by the Bank, it is apparent the true solution of this problem must depend, not on the extent of the power possessed by the agent to bind his principals by his contracts for the purchase of cotton at all, for his acts in that regard were clearly within the scope of his employment as contemplated by the parties, but it must depend on whether the borrowing of money on account of his principals, and the pledging of their securities for its repayment, was a necessary incident to the business of purchasing the cotton. If so, the authority will be. implied from the general grant of power conferred, and the principals will be held to have contemplated it when the agency was formed, and to be bound by its exercise by the agent because within the scope or the apparent scope of the employment of the agent, and the Bank would be justified in dealing with Carter as it did in this case.

As shown by the evidence, the only warrant of authority claimed by the Bank to bind Wolff & Co. by the agreement made and transactions had with Carter were his acts done and declarations made to the Bank, and the apparent authority with which he acted in the business of his principals. The Bank did not, as it might have done for its protection, first learn the full extent of the power possessed by Carter from his principals, but, on the contrary, assumed to engage in the business without any investigation and in reliance on appearances and the word of the agent; hence, if loss befall it, such loss must be attributed to its neglect to properly advise itself before engaging in the business.

It is well settled in law the acts and declarations of an agent are incompetent to prove the extent and scope of his power to bind his principals. Story on Agency (9th Ed.) § 83; Mechem on Agency, §

395; Walmsley v. Quigley, 129 Fed. 583, 64 C. C. A. 151; Union Guaranty & Trust Co. v. Robinson, 79 Fed. 420, 24 C. C. A. 650; Merchants' Nat. Bank v. Nichols & Shepard Co., 223 Ill. 41, 79 N. E. 38, 7 L. R. A. (N. S.) 752; Bickford v. Menier, 107 N. Y. 190, 14 N. E. 438; Consolidated National Bank v. Pacific Coast S. S. Co., 95 Cal. 1, 30 Pac. 96, 29 Am. St. Rep. 85; Whitan v. Dubuque & S. C. R. Co., 96 Iowa, 737, 65 N. W. 403; Bacon v. Johnson, 56 Mich. 182, 22 N. W. 276. The granting of power to an agent to borrow money on account of his principals, and to pledge their property as security for its repayment, is an unusual confidence to repose in the discretion of an agent, and being a grant of unusual power, to establish its existence, either express authority from the principals must be shown, or the very nature of the business to be transacted by the agent must require the exercise of such extraordinary authority, and this is true whether the agency be general or special in character.

Mr. Story in his work on Agency (9th Ed.) § 83, says:

"If the authority is special, it is construed to include only the usual means appropriate to the end. If the authority is general, it is still construed to be limited to the usual means to accomplish the end. Even if a general discretion is vested in the agent, it is not deemed to be unlimited; but it must be exercised in a reasonable manner, and cannot be resorted to in order to justify acts which the principal could not be presumed to intend."

This court in Pacific Lumber Co. v. Moffat, 134 Fed. 836, 67 C. C. A. 442, said:

"Vreeland's authority as agent to purchase and sell lumber and shingles and to manage that business for defendant, however general, did not authorize him to obligate and bind his principal to pay the debt of another. Mechem on Agency, §§ 307, 313, 392, 400."

Ruger, Chief Justice, delivering the opinion of the Court of Appeals of New York in Bickford v. Menier, 107 N. Y. 490, 14 N. E. 438, very clearly stated the rule which we conceive applicable to the facts of this case, in the following language:

"The plaintiff has been allowed to recover in the action upon the theory that the borrowing in question was within the apparent scope of the agent's authority, and this question was left, as one of fact, to be determined by the jury. We are of the opinion that the court erred in this respect, and that there was no evidence in the case authorizing a verdict for the plaintiff. The apparent authority in this case was precisely coextensive with the actual authority. The agent's real authority was confined to the duty of receiving consignments from the Meniers, storing and caring for them, and, after paying the expenses of the business from the receipts, to remit the balance to the Meniers. If the transaction of this business absolutely required the exercise of the power to borrow money in order to carry it on, then that power was impliedly conferred as an incident to the employment; but it does not afford a sufficient ground for the inference of such a power to say that the act proposed was convenient or advantageous, or more effectual in the transaction of the business provided for, but it must be practically indispensable to the execution of the duties really delegated, in order to justify its inference from the original employment."

In Merchants' Nat. Bank v. Nichols & Shepard Co., 223 Ill. 41, 79 N. E. 38, 7 L. R. A. (N. S.) 752, Cartwright, Justice, delivering the opinion for the Supreme Court of Illinois, said:

"The source of authority is the principal, and the power of the agent can only be proved by tracing it to that source in some word or act of the alleged

174 F.—59

principal. In this case there was no evidence tending to prove that the power to borrow money was an 'incident of the agency. For such an act as that an agent must have express authority, or some power must be expressly conferred upon him which cannot be otherwise executed."

See, also, Ricker National Bank v. Stone, 21 Okl. 833, 97 Pac. 577; National Loan & Investment Co. v. Bleasdale (Iowa) 119 N. W. 77.

As has been seen, Carter possessed no express authority from his principals except to purchase cotton on their account and draw on them with bills of lading attached in payment therefor. In this manner the cotton in question was purchased. In the performance of this service for his principals there was no necessity for Carter to open an account in the name of his principals with the Bank, borrow money therefrom, and pledge the property of his principals in payment. Not only is this so, but the very method employed in the transaction of the business, which was open and known to the Bank, precludes the Bank in this case from assuming or believing the transactions had by Carter with the Bank were within the scope of his authority as agent. Therefore, the objections taken on the trial to the evidence of the witness Dwyer wherein he detailed a conversation with the agent Carter, in which it was agreed by Carter the account of Wolff & Co. with the Bank should be opened, was opened, and which resulted in Carter borrowing money therefrom on his own account and pledging the bills of lading, the property of his principals, as collateral security therefor, in advance of any showing of authority on the part of Carter of his right to bind his principals by such agreement, and in advance of any evidence showing or tending to show his principals, Wolff & Co., with full knowledge of the unauthorized acts of their agent had ratified them, were well taken and should have been sustained, and the trial court erred in not so holding and ruling.

But it is further contended by the Bank, even though the agent Carter possessed no authority in the first instance to bind his principals by his dealings with it, yet his principals with full knowledge of his unauthorized acts ratified and approved the same and are bound thereby. This theory of the case is based principally upon a communication claimed to have been written by the president of the Bank to Wolff & Co., concerning which the following evidence of the president of the Bank is found in the record.

"Q. Mr. Dwyer, I wish you would please state to the jury whether or not you ever notified A. L. Wolff & Co. at any time, during the time this account was carried in his name at your bank, of any overdraft due at the bank on the account? A. Yes, sir. Q. About what date, if you remember? A. I think it was close of business for the month of October. Q. At what place did you notify them, Oklahoma City, St. Louis, or what place? A. St. Louis. Q. In what manner, Mr. Dwyer, did you give him this notice? A. Took off the average overdraft for the month of October and figured the interest on it and put it in the copy book and figured it out, and mailed it to them at St. Louis; I did myself. Copy of it is in the letter book here. Q. In the regular course of mail or otherwise? A. Regular course of mail. Q. To whom was the letter addressed? A. A. L. Wolff & Co., St. Louis, Mo. Q. Was it or was it not mailed in the regular course of the mail? A. It was mailed in the regular course of mail. Q. And the regular United States stamp or postage put on it? A. Yes, sir."

To our minds this evidence falls far short of establishing such a ratification by Wolff & Co. of the unauthorized acts of the agent

Carter with the Bank as will permit a recovery in this case, and for many reasons. While it is true in most instances that proof of the writing and posting of a letter properly addressed, in the absence of further evidence, raises a presumption of the delivery of such letter to the person to whom it is addressed, yet this presumption can have but little if any probative force in this case, and for this reason. To raise the presumption of delivery, it must be shown as a fact the letter was properly addressed. The firm here addressed transacted business in a large and populous city. The address is to the city generally, and is not specific either as to the street number or building in which the business is conducted, or as to the nature of business conducted by the firm. In such case the letter was not properly addressed. There may be many firms of the same name engaged in business in a city the size of St. Louis. A letter so addressed may or may not have come into the hands of the firm. Fleming & Ayrest Co. v. Evans, 9 Kan. App. 858, 61 Pac. 503. In this case the evidence discloses the firm disclaimed all knowledge of such letter and a diligent search failed to discover it among their files.

Again, the claim of the Bank in this case is based on the pledge of collateral made by Carter to secure any overdraft in the Bank, and not to recover the amount of such overdraft. This action was brought against the Railway Company and not against Wolff & Co. To recover in this case the Bank must establish the existence and validity of the pledge made to it of the collateral by Carter as agent. Mr. Justice Peckham, delivering the opinion of the court in United States v. Beebe, 180 U. S. 343, 21 Sup. Ct. 371, 45 L. Ed. 563, said:

"Where an agent has acted without authority and it is claimed that the principal has thereafter ratified his act, such ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken. This is as true in the case of the government as in that of an individual. Knowledge is necessary in any event. Story on Agency (9th Ed.) § 239, notes 1 and 2. If there be want of it, though such want arises from the neglect of the principal, no ratification can be based upon any act of his. Knowledge of the facts is the essential element of ratification, and must be shown or such facts proved that its existence is a necessary inference from them."

Therefore, in this present case, even should it be presumed the letter claimed to have been written by the president of the Bank was received by Wolff & Co., it would have conveyed no intelligence to Wolff & Co. that Carter had assumed to pledge their property to the Bank as collateral for money borrowed on their account. Manifestly, therefore, the existence and validity of the pledge claimed in this case by the Bank, and which it must establish or fail to recover, cannot be made out on the theory of ratification because it is not shown Wolff & Co. had any knowledge of its existence until about December 10th when it was promptly repudiated and its authority denied.

The only question remaining for disposition is that of the sufficiency and effect of the tender made the Bank by Wells, the representative of Wolff & Co., as pleaded in this case.

At the time of the making of this tender, the officer of the Bank to whom made refused to accept it and turn over the evidence of the ownership of the cotton in its possession for two reasons: (1) Because the tender was unaccompanied by the written consent of Carter,

the agent who had made the pledge with the Bank; (2) because Wolff & Co. in making the tender refused to pay the amount tendered the Bank, and relieve it from all further liability in the premises.

In this connection it is the claim of plaintiff in error as the amount tendered was in the full amount claimed by the Bank, and, as the grounds on which it placed its refusal are claimed to be untenable, the court should have directed the verdict for the Railway Company requested by it on the trial. On the contrary, it is the contention of the Bank, as the tender made was not unconditional, the Bank had the right to reject it when made; and, further, it is contended such tender and the act of the Railway Company in pleading it as a defense to this action constitute such an admission of liability on the part of Wolff & Co. to the Bank as will conclude the Railway Company and entitle the Bank to a judgment for the amount tendered.

In the view we have taken of the case, as above stated, it becomes necessary to consider only the claim made by the Bank. In this connection it is proper to state the insistence of the Bank is not that the tender itself is such an admission of liability as will preclude the maker thereof from disputing the amount tendered to be due, but the fact that the tender made was pleaded as a defense to an action arising out of the transaction in which the tender was made. And in support of this contention the general rule, as stated by Mr. Hunt in his work on Tender, § 401, is relied on, as follows:

"A plea of tender is an unequivocal admission of the justice of the plaintiff's claim to the extent of the sum tendered. So conclusive is the admission that if the tender is refused, and the parties proceed to trial, and it shall turn out that the plaintiff was not legally entitled to anything, the plaintiff shall have a verdict for the sum tendered."

However, in our opinion there is no room for the application of this general rule to the facts of this case, and for this reason: The rule as stated has application to such unconditional tenders as contain solemn admissions made of record. It is not the act of tender, but the admission of the party making it, made indisputable by his bringing it on the record by his plea and demanding relief of the court because of his admission, that binds and concludes the party making it. Therefore a plea or so-called plea of tender which contains no admission of the party making it is not a good plea, for it neither admits any right in the party to whom made nor estops the party making it. It therefore becomes essential in the determination of the question presented to examine the tender made and pleaded in this case.

The written demand of Wolff & Co. to which reference is made in the offer of tender, and the tender itself, as above set forth, must be construed together as one transaction. So construed, the situation of the parties was this: The Bank was in possession of the indicia of ownership of cotton, aggregating almost $90,000 in value, which belonged to Wolff & Co., and was in the actual possession of the Railway Company. By reason of such possession the Bank asserted a lien on the cotton to secure the comparatively small sum of $6,834.54. Wolff & Co., claiming to be the absolute owners of the cotton, demanded the surrender of the evidences of ownership in order to en-

able them to demand the cotton from the Railway Company. This demand was refused by the Bank. Thereupon Wolff & Co. reasserting their absolute ownership of the cotton and their right to the documentary evidence of such ownership in possession of the Bank, and denying any and all claim of the Bank thereto, under protest made offer to the Bank of the amount claimed by it to protect themselves against further loss by being thus deprived of the actual possession of perishable personal property. of large value. And this offer so made to the Bank is that pleaded by the Railway Company in defense of this action brought by the Bank to secure the actual delivery of the cotton to it, or in case such actual delivery could not be adjudged by the Court, to recover the value of its special interest claimed therein.

It is thus seen neither by the form of the offer made by Wolff & Co. to the Bank, nor that pleaded by the Railway Company in defense of this action, was the validity or the amount of any claim asserted by the Bank recognized or admitted by Wolff & Co. or the Railway Company. On the contrary, it was at all times by them denied and disputed, and, as shown by the record, this fact is recognized by the Bank throughout this entire litigation, for that it both moved to strike and demurred to the plea of tender interposed by the Railway Company for this reason; and, further, by its reply, challenged the sufficiency of the plea of tender made on this very ground and now insist the tender was properly rejected by the Bank because not an unconditional admission of liability by Wolff & Co.

As neither the offer made to the Bank nor the plea interposed by the Railway Company in defense to this action contains any admission of the validity of the claim of the Bank to the cotton in any amount, it must be held the Bank was not entitled in any event to a judgment in its favor for the amount offered, under protest, to obtain the release of the cotton.

It follows judgment must be reversed, and the case remanded for a new trial.

It is so ordered.