## BENEDICTINE SOC. v. NATIONAL CITY BANK OF NEW YORK.
### No. 7121.

Circuit Court of Appeals, Third Circuit.
Jan. 20, 1940.

Edward P. Doran, and Vincent E. Williams, both of Greensburg, Pa., for appellant.

Elder W. Marshall, Thomas W. Pomeroy, Jr., and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., and Andrew Kirkpatrick, and Shearman & Sterling, all of New York City, for appellee.

Before MARIS, CLARK, and BIDDLE, Circuit Judges.

CLARK, Circuit Judge.

This is an unusual case. In fact, so unusual that the form our opinion should take has been embarrassing to us. We wish that our adversary system had made some provision for advisory judgments. It is certainly on that basis that this defendant-appellant is now before us. We are sure that this ancient and sacred religious Order subscribes to the words of a justice of the Supreme Court of the State of Virginia in dissenting from a rather technical decision of his colleagues: "Zehm knew, the people generally know, and the lawmakers, legislators, and courts know, that Christian denominations of this state are governed by a higher law than statute or decision, and do not require the sheriff to compel them to meet their moral obligations." Forsberg et al. v. Zehm, 150 Va. 756, 143 S.E. 284, 290, 61 A.L.R. 232.

In Mr. Coolidge's famous phrase, they "hired" $250,000 from the plaintiff-appellee bank on October 28, 1929, and now eleven years later are resisting the repayment of this not inconsiderable sum or any part thereof (even to the extent of pleading the statute of limitations as a bar). That money was spent in the Chinese missionary field and without doubt the reason for their present attitude lies in the dilemma, with which we are most sympathetic, occasioned by the tragic events in China.

That religious Order is the Benedictines or Black Monks, Butler, Benedictine Monachism; Taunton, English Black Monks of St. Benedict, Vol. 1.[1] The United States

---

[1] This Order is of especial interest to America because it was from their monasteries on the Caelian Hill that St. Augustine (whose 'not Angles, but Angels," is one of our earliest historical recollections) went forth on his mission to England. The Catholic Encyclopedia gives this account of the founding of the Order in the United States: "The Benedictine Order was first established permanently in America by Dom Boniface Wimmer, of the Abbey of Metten, in Bavaria. A number of Bavarians had emigrated to America, and it was suggested that their spiritual wants in the new country should be attended to by Bavarian priests. Dom Wimmer and a few companions accordingly set out in 1846, and on their arrival in America they acquired the church, a house, and some land

branch of the Order is known as the American Cassinese Congregation (St. Benedict migrated to Monte Cassina and established a central monastery there), Hasting's Encyclopaedia of Religion and Ethics, Vol. 2, pp. 792–796. It includes, besides St. Vincent Archabbey, nine other Abbeys, most of which had colleges or schools attached thereto. The missionary work of the Congregation, at least up until the circumstances giving rise to the present case, seems to have been among the Indians, Catholic Encyclopaedia, Vol. 2 (1907), p. 460. The governance of the Order varied from completely autonomous abbeys to the more centralized administration under the abbot of Cluny and then back to the rather loose federation of more modern times, Cardinal Gasquet, Sketch of Monastic Constitutional History (reprinted in Monastic Life in the Middle Ages, 1922). A more minute examination of this structure might very well have led to a different theory of trial.[2]

As the matter stands, we are left with a failure of proof except in respect to the particular defendant. That defendant is the Benedictine Society incorporated under a special act of the State of Pennsylvania, "An Act to Incorporate the Benedictine Society in Westmoreland County, Pennsylvania," 1854 P.L. 842. The statute constituted certain named Benedictine monks, including the founder Dom Boniface Wimmer, "religious men living in a community and devoted to charitable works and the education of youth," a body politic and corporate having as essential objects inter alia "the care and education of youth."

The Order's interest in the foreign as contrasted with the domestic missionary field began in 1922. In that year the Holy See (Pius XI) requested the Benedictines of the United States to establish a school in Peking, China. This request was first made to St. Vincent Archabbey but was refused as too great a single responsibility. However, on June 7, 1923, the Archabbey sent two of their members, Fathers Ildephonse and Placidus, to China and paid their expenses from their funds in the bank at Latrobe, Record p. 120. The subject was then referred to the Right Reverend Praeses of the American Cassinese Congregation, and on August 8, 1923, the General Chapter of that Congregation adopted a resolution: "that St. Vincent Archabbey undertake the establishment of the school, the other abbeys of the Congregation cooperating." This resolution was in turn on October 5, 1923, submitted to a meeting of the capitulars of St. Vincent Archabbey and was acceded to by a vote of 14 affirmative, 7 negative, 8 indifferent. The cooperation of the other abbeys spoken of in the resolution apparently did not materialize because we see in the minutes of February 18, 1926, that the Archabbot reported: "Other Benedictine Abbeys of our Congregation have been asked to assist in carrying the financial burden of the Foundation, but, as many are in debt we can expect little from them."

On June 23, 1924, Archabbot Stehle received permission (renewed in 1929) from His Holiness in Rome to assign professors to and arrange courses of study in the University to be erected in Peking. The first purchase of property in the Celestial City was consummated in 1925. The Archabbot personally conducted the negotiations and the title to the estate of Prince Tsai Tao

---

belonging to the small mission of St. Vincent, Beatty, (in Westmoreland County, Pennsylvania, near Latrobe) Pennsylvania, which had been founded some time previously by a Franciscan missionary. Here they set to work, establishing conventual life, as far as was possible under the circumstances, and applying themselves assiduously to the work of the mission. Reinforced by more monks from Bavaria and their poverty relieved by some munificent donations, they accepted additional outlying missions and established a large college. In 1855 St. Vincent's which had already founded two independent priories, was made an abbey and the mother-house of a new congregation, Dom Wimmer being appointed first abbot and president." Catholic Encyclopaedia, Vol. 2 (1907), p. 452.

[2] For instance, the Catholic Encyclopaedia has this to say: "Each congregation is composed of a certain number of monasteries, the abbots of which, with other officials and elected representatives, form the general chapter, which exercises legislative and executive authority over the whole body. The power possessed by it is strictly limited and defined in the constitutions. The meetings of the chapter are held usually every two, three or four years and are presided over by one of the members elected to that office by the rest. Whilst the office of abbot is usually for life, that of the president is generally only for a term of years and the person holding it is not in all cases eligible for continuous re-election." Catholic Encyclopaedia, Vol. 2 (1907), p. 459.

was taken in the name of St. Vincent Archabbey in 1925 (the exact date not appearing). On March 20th of that year, the Archabbot granted to Fathers Ildephonse and Placidus and one Dr. O'Toole three powers of attorney to operate bank accounts in and borrow money from the plaintiff's predecessor bank. These powers of attorney are made out in the name of Archabbot Stehle, Chancellor of the Catholic University in Peking and signed by him as both Archabbot and Chancellor. On August 19, 1925, the Holy See granted the China Foundation a special novitiate and Fathers Clougherty and Healy took their vows for St. Vincent Archabbey with the significant qualification "until the place" (i.e. the University) "becomes independent." On February 18, 1926, the Large Order of St. Vincent Archabbey authorized a loan of $25,000 to the China Foundation by a vote of 18 affirmative, 5 negative, and 7 indifferent.

Thereafter the receipts from charitable donations fell below the needs (more ground and buildings) of the University. Accordingly their augmentation by borrowing was first discussed in 1927 and was finally consummated in 1929. We think the transaction was in no wise mysterious, as appears quite clearly from the mouths of the borrowers themselves. In the minutes of the Large Chapter of St. Vincent Archabbey for September 30th and October 28th, 1927, the following is found: " * * * In the discussion of the question, Who would be authorized to sign the notes for the University, Father Archabbot declared that as Chancellor of the University, he has this right; and, as the present property was bought in the name of St. Vincent Archabbey, as 'The Benedictine Society in Westmoreland County,' because the University of Peking was not an 'incorporated society,' this could be done also in this case." Minutes, September 30, 1927.

" * * * Father Placidus spoke in favor of buying the half of the estate, and Father Archabbot said that he could get a loan of $200,000 with five per cent interest for the University. In the discussion the fact was emphasized that the *risk* of St. Vincent is very little, but that a legal corporation in the United States would have to *authorize* the transaction, to be *valid* before law. Thereupon the following proposition was made: St. Vincent Chapter grant assent to take up a loan of $85,000 now for the purchase of one-half of the property of Kung Wong Fu (9 acres) and

the taxes of this sale, and later $15,000 for necessary repairs and changes of buildings. The note of this indebtedness to be signed by the president and procurator of the Catholic University of Peking, to be filed with the procurator of St. Vincent Archabbey (The Benedictine Society in Westmoreland County), and in the event of Foundation becoming independent this indebtedness shall remain until liquidated. The Chapter agreed with the following ballot: Affirmative 14, negative 8, indifferent 7." Minutes, October 28, 1927, (Italics ours.)

It is probable that the Right Reverend Archabbot felt in 1929 sufficiently authorized by the resolution of 1927 above quoted. In any event, he dispensed with further formal action by the Large Chapter of the Archabbey and proceeded to borrow the money from the plaintiff. The pertinent correspondence reads as follows:

"My dear Archabbot,
          *          *          *          *          *

"As a National Bank we are not allowed to make mortgage loans in Peking but we shall be glad to make the advance on the strength of a letter from your Order *authorizing* the advance to be made to the Catholic University of Peking and *guaranteeing* due payment thereof." Letter of October 28, 1929, from M. D. Currie, Assistant Vice President, the National City Bank, New York City. (Italics ours.)

"My dear Mr. Currie,

"It is with genuine appreciation that I acknowledge the receipt of your letter pertaining to our Catholic University of Peking taking up a loan during February of the coming year.

"As mentioned when I called personally at your bank, we have a large deposit account and can likely finance readily for the next two or three months. Meanwhile, I shall make every effort to procure additional donations." Letter of October 30, 1929 from Archabbot Stehle, Chancellor Catholic University of Peking.

This correspondense is commented on by Mr. Currie in a letter to the manager of a local branch in Peiping: " * * * While we would have preferred to make the loan direct to the St. Vincent Archabbey, the Archabbot explained that for a variety of reasons he did not wish to follow this procedure and we agreed that after all our request was made on more or less technical grounds. He explained of course that the entire Catholic Church is

behind this project and he also showed us a message from Pope Pius XI, evidencing the interest of the Holy See in this particular mission." Letter of November 15, 1929 from M. D. Currie, Assistant Vice President, the National City Bank, New York City.

The human relations revealed by these facts are plain. An incorporated, and so de jure, Chapter of a religious Order is confident of the cogency of its appeal for the propagation of the faith among the Chinese. It sees no need therefore to postpone its work and makes application to a banking institution for the necessary funds. Negotiations on behalf of the borrower are conducted without legal advice by the head (Archabbot) of the Chapter, who is also head (Chancellor) of the de facto group (University) created to expend the money for the purposes (education of the Chinese) in which the religious order is interested. The money is advanced to this de facto group after a "paper" resolution of the de jure body authorizing an earlier and incompleted transaction, and an exchange of letters authorizing and guaranteeing the repayment of the completed loan.

■ Does the law implement these human relations? We think it does. A reasonable argument for express authority might be made. After all, the word risk, used in the minutes of October 28, 1937, Record p. 164, is only appropriate to an obligation. A reasonable argument for implied authority might be, and is in fact, made by the plaintiff. It cites the rule of law as phrased in 1 Restatement of the Law of Agency (American Law Institute 1933), Chapter 3, Creation and Interpretation of Authority and Apparent Authority, Topic 3, Interpretation of Particular Authorizations, Title G, Authorization to Borrow, § 74, When Authority is Inferred. It will be noted that the rule is postulated in conditional form and reads: "Unless otherwise agreed, an agent is not authorized to borrow unless such borrowing is usually incident to the performance of acts which he is authorized to perform for the principal." 1 Restatement of the Law of Agency (American Law Institute, 1933) § 74, p. 178.

The reason for this negative form of statement is well explained by the Circuit Court of Appeals for the Eighth Circuit: " * * * The granting of power to an agent to borrow money on account of his principals, and to pledge their property as security for its repayment, is an unusual confidence to repose in the discretion of an agent, and being a grant of unusual power, to establish its existence, either express authority from the principals must be shown, or the very nature of the business to be transacted by the agent must require the exercise of such extraordinary authority, and this is true whether the agency be general or special in character." Chicago R. I. & P. R. Co. v. Chickasha Nat. Bank, 174 F. 923, 929, and see also cases cited in 2 C. J.S. Agency, page 1294, § 110. Whether borrowing money is ordinarily incident to the business of founding and building a University is perhaps a close question. Its answer would seem to depend on usual opinion as to the efficacy of showing hoped for subscribers the finished product rather than the blue-prints.

■ We prefer a ground that is both more sure legally and more in keeping with what must be the ethical position of this particular defendant. The interpretation of authority of an agent is unnecessary where ratification is present. The Restatement in Chapter 4, Ratification, Topic 3, What Constitutes Affirmance, includes the subheadings § 98, Receipt of Benefits as Affirmance, and § 99, Retention of Benefits as Affirmance. Section 98 reads: "The receipt by a purported principal, with knowledge of the facts, of something to which he would not be entitled unless an act purported to be done for him were affirmed, and to which he makes no claim except through such act, constitutes an affirmance unless at the time of such receipt he repudiates the act. * * *" 1 Restatement of the Law of Agency (American Law Institute, 1933) § 98, pp. 243, 244.

All the Pennsylvania cases cited in the briefs are collected in 1 Restatement of the Law of Agency (American Law Institute, Pennsylvania Annotations, 1936) § 98 and these and many more are to be found in an excellent note in 7 A.L.R. p. 1446 et seq., entitled, Ratification by Corporation of Unauthorized Contract Entered Into by Officer, by Acceptance and Retention of Benefits. The rule is, of course, general; but as to the particular type of principal here in suit, the cases are collected in the West Digest System under Religious Societies, ☞31 (5), and see, Davidsville First Nat. Bank v. St. John's Church, Windber, 296 Pa. 467, 146 A. 102; Reifsnyder v. Dougherty, 301 Pa. 328, 152 A. 98. A United States judge and a

Pennsylvania justice in speaking of corporations similar to the one at bar give succinctly the reasons for the rule: " * * * The corporation was a close one, in which but few persons were interested, nearly all of whom were actively connected with its management. Such concerns frequently act informally—as this one had constantly done—and are careless about their votes and records. If action, not ultra vires, is taken in the name of the corporation by an officer or agent assuming to act for it, and is known to and approved by the persons intrusted with the management of its affairs, the corporation is bound, without any formal vote. * * * Such authority or ratification is more easily inferred where, as here, the corporation receives and retains property under the contract in question." In re National Piano Co., D.C., 252 F. 950, 951.

" * * * It is repugnant to every sense of justice and fair dealing that a principal shall avail himself of the benefits of an agent's act and at the same time repudiate his authority." Presbyterian Board of Relief for Disabled Ministers, Etc. v. Gilbee, 212 Pa. 310, 61 A. 925, 926.

Counsel for the plaintiff stressed and his opponent attempted to rebut the identity of the Catholic University in Peking and St. Vincent Archabbey in Pennsylvania. We think that identity was clearly established. In addition to the facts already recited the minutes of the Archabbey of the Large Chapter are replete with instances of direction from home, and the funds of the two institutions were commingled. We do not believe, however, that a finding of such merging is essential to the application of the receipt and retention of benefits rule. Even assuming a separate de facto organization in China we have a contract of guaranty applicable to the advances made thereto, 24 Amer.Jur. § 71. We think that the guarantor must equally repudiate the act of its agent under the logic of the rule of agency. The benefits are accorded in reliance on the guaranty and the lender is therefore entitled to be advised of the agent's lack of authority.

We do not deem the suggestion that the statute of limitations is a bar worthy of discussion. Plaintiff in its brief correctly points out the eighteen months given to liquidate the loan and further correctly states the rule with respect to reasonable time.

The judgment of the District Court is affirmed.